(C. D. 847)

Synthetic Patents Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided April 29, 1944)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Eugene A. Chase* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Frank X. O'Donnell, Jr.*, and *Robert C. O'Grady*, special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: Plaintiff imported for its affiliate, Winthrop Chemical Co., a commodity invoiced as "Lipoid extract of brain—Pharmaceutical non coal-tar intermediate." The collector classified the merchandise as a medicinal preparation under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), which provides for:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

Several claims are made in the protest. Some were abandoned at the trial, and others have not been stressed in the briefs. Plaintiff relies principally, if not entirely, upon the claim for classification under paragraph 1558 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 1558), reading as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Plaintiff's sole witness was Dr. O. W. Barlow, an amply qualified biochemist and pharmacologist, who is director of the biological research laboratories of Winthrop Chemical Co. His regular duties

include "direct charge of all biological control work; also supervision of the chemical control laboratories, as well as whatever research work is done in biology." His testimony relates entirely to the manipulation of the imported merchandise after its receipt in the laboratories of his company, making it available as a commercial product. Under his immediate supervision, the imported merchandise was biologically assayed, bacteriologically tested, and chemically analyzed.

According to Dr. Barlow, the imported commodity is a concentrate, consisting of lipoid extract of brain, lipoid extract of bile, proteins, phenol, alcohol, and salt. A "lipoid" is "a fatty substance of variable melting point, that in general could be used either for food, if it happened to be of certain types; it could be used for the preparation of soaps" (p. 12). A chemical analysis revealed the following proportions of ingredients (p. 12):

| | |
|---|---|
| Lipoids (total) | 580 milligrams. |
| Protein | 11 milligrams per 100 grams. |
| Alcohol | 19:35 per centum. |
| Phenol | .45 per centum. |
| Salt | negligible. |

The initial test is one for sterility, conducted according to regulations of the National Institute of Health. The importation in question was found by him to be sterile, and all subsequent processes were "carried out under sterile conditions; in other words, aseptic technique complete." The biological assay is made to determine potency. The product is diluted into various proportions, described in his testimony as follows (p. 37):

A sample of this material was diluted in various fractions, diluted 1 and 24, 1 and 40, 1 and 50, 1 and 60, 1 and 80, 1 and 100, 1 and 120, normal saline. Each of those dilutions were then tested on a series of animals in order to determine what particular dilution would be the final dilution for the commercial product.

Albino rabbits are used for the purpose. They are standardized on the basis of response of white blood-cell count. Following dosages with the material, the animals are checked at hourly intervals. To obtain a standard assay "a particular dose would produce at least a 50 per centum increase in white cell count during the period of 8 hours following the administration." The result forms the basis for diluting the imported merchandise to a proper degree for production of the final commercial product. Dilution of the instant merchandise was "one and seventy." In other words, the material as imported was 70 times stronger than when it was offered under a commercial label.

The findings of sterility and potency become the subject of instructions to the manufacturing department on the manner of treatment to prepare the final commercial item. The freezing point is deter-

mined, from which a calculation is made to obtain the quantity of sodium chloride (salt) necessary to render the material isotonic, "so it would have exactly the same osmotic pressure as human blood," which has the effect of making the product more tolerant when administered. As an added precaution for assurance of sterility, the material "is essentially pasteurized for 1 hour on two successive days," and sufficient phenol is added to make the quantity five-tenths of 1 per centum. The processed solution is then placed in ampoules or vials. Sample lots thereof are subjected to the same line of treatment applied to the merchandise on importation before it is finally distributed under the label "Omnadin," collective exhibit 2 ("For the medical profession") and collective exhibit 4 ("For the veterinary profession").

The imported merchandise is the only active principle in "Omnadin" which is offered as a remedy for "respiratory ailments." It is injected subcutaneously or intramuscularly and is known to have been used in tuberculosis, pneumonia, peritonitis, and for infections resulting from surgical operations. It is administered for such purposes to both humans and animals, and is prepared at different strengths for the two different classes; that "used in the animal field is four times as strong as the human." Its use in animals is devoted principally to small pets, like cats and dogs, the necessarily large application for cattle and horses being too expensive to permit extensive use thereof.

The witness stated that the imported merchandise could not be used medicinally, "because it wouldn't be released for use," giving the following reasons (p. 27):

In the first place we have no assurance the material is sterile as it is received. The product is not isotonic. The product is any place from 60 to 100 times as strong as the final commercial material would be. It would be extremely painful in local administration, and a doctor administering this material as it is received, he would lose a patient, and the patient would refuse to see the doctor again, because of pain, local reaction.

and adding further, "it would invariably produce a fever lasting any place from 18 to 36 hours."

On cross-examination the witness admitted that the sole purpose of processing the imported merchandise was to determine its power to create physiological activity, and that the addition of sodium chloride, to establish isotonicity, and phenol, to maintain sterility, in no way affected the therapeutic properties of the product.

Defendant's witness was Dr. David W. Fassett, who received his Doctor of Medicine degree from New York University and his Bachelor of Arts at Columbia College. He conducted research work in biochemistry at the College of Physicians and Surgeons, and since November 1942, he has been connected with the United States Food and Drug Laboratories in Washington, D. C., as chief of the Division

of Pharmacology of the Food and Drug Administration, where his duties are "to test the toxicity of drugs which are submitted to us and to test and to bioassay various drugs, and to see that such assays are carried out properly under my supervision and to decide whether materials submitted to us are safe for use." In his present capacity he also supervises the testing of imported drugs for "therapeutic values and to decide whether or not the labeling is correct, whether such drugs are what they are claimed to be." He has seen "Omnadin" used and observed the results of its injections, and "talked with a number of physicians who have used the drug."

Substantially all of this witness' testimony is a reasoning to support his opinion that the processing of the imported merchandise after its receipt by the Winthrop Chemical Co. did not change or affect its therapeutic value. His explanation supports the following facts: in testing for the different purposes mentioned, only a very small quantity of the imported product is used; the bulk remains entirely unchanged. In the test for sterility, only "a very tiny fraction of a cubic centimeter" is removed from an ampoule usually by "a small microhm loop of wire" and "cultured on various bacteriological testing media." None of the processes for sterility had an effect since the material was sterile at the time of importation, and "further pasteurization could not make it more sterile." Finding the freezing point is a determination for concentration. Only a "small amount of material" is used and the procedure has no effect on the therapeutic properties but is merely "part of the manufacturer's control process to determine the state of his merchandise as it is imported." The biological assay is assurance for the manufacturer that the finished product has the potency at which it is offered commercially. Dilution of the imported solution has no effect on the active ingredients thereof; "the nature of the response of the body to the injection of this material is exactly the same, although the degree might vary." The treatment for isotonicity seeks to give the finished preparation the same "content of salt as solutions in the body," and tends to make injections "have a less irritant effect upon the body tissues." It was emphasized, however, that the degree of isotonicity is largely a question for the doctor to determine, that the manufacturer's dilution may not satisfy the practicing physician who will make further adjustments before administering the preparation to a patient, and that there is no uniform opinion that a solution "which is injected subcutaneously or intramuscularly shall be isotonic." The testimony in this connection is (p. 71):

X Q. Now, Doctor, have you administered a mixture of lipoids and proteins in a solution which is not isotonic?—A. Yes.

X Q. And is there any difference in the effect on the patient of the administration of such a solution which is not isotonic and one which is isotonic?—A. There might be a difference in the local effect at the point of injection.

X Q. What would the nature of that difference be, from your own observations?—
A. From my own observation an isotonic solution might be absorbed more rapidly and cause less of a local effect, such as swelling and pain. On the other hand, in the opinion of a good many physicians, since this local effect is part of the therapeutic activity of the material, that is, this irritant effect, which I have seen with Omnadin as it is even in the isotonic solution, is part of the process by which this material works; that is, it irritates the body and induces it to give rise to an increased white count. For instance, milk which is a solution certainly of lipoid and proteins has been used, an injection of milk, to give rise to stimulate the responses of the body. So that I do not believe that the isotonicity is an absolute prerequisite of the material which is to be injected; I would put it that way.

The witness concluded that "none of these procedures have changed in any essential way the therapeutic properties of this material as imported. They have been for the purpose of a manufacturer's control of this material. It is done with every product which is meant for injection." Finally, he expressed the opinion "I believe the material is a medicinal as it is imported."

The proof adduced herein very closely parallels the combined testimony in *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 98, C. D. 803, and *same* v. *same*, 11 Cust. Ct.157, C. D. 816. As a matter of fact, plaintiff's witness in this case also appeared in the two cited cases. Each of them involved a particular kind of hormone with therapeutic properties and used for medicinal purposes. In both, the question presented was whether the merchandise was a medicinal preparation, as classified, or a drug, as claimed.

Here, the alcoholic content, approximately 20 per centum, which prevents "separation of the lipoids and the aqueous layer" in the imported solution specifically excludes the instant merchandise from classification as a drug under paragraph 34, *supra*, or paragraph 1669, *supra*, by reason of the proviso thereto that no article containing alcohol shall be classifiable thereunder.

Plaintiff's principal claim for classification as nonenumerated merchandise under paragraph 1558, *supra*, however, cannot be considered until it is determined that the merchandise in question is not within any of the enumerated classifications of the tariff act. *General Electric Co.* v. *United States*, 4 Ct. Cust. Appls. 398, T. D. 33839.

The undisputed character and use of the imported merchandise brings it squarely within the tariff status of a medicinal preparation as set forth in *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038, wherein the court said: "Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal." The difference between the two tariff classifications referred to was made in the *Synthetic Patents Co., Inc.*, case, C. D. 803, *supra*, in the conclusion that the term "drug" connotes a substance or

material useful for medicinal purposes, and a "medicinal preparation" is a product with therapeutic qualities, ready for medicinal use. That principle was also followed in the *Synthetic Patents Co., Inc.*, case, C. D. 816, *supra*. As hereinabove stated, we are not required to make such distinction here. The convincing proof that the imported product possessed therapeutic properties dedicating it to its exclusive use for medicinal purposes is sufficient, within the pronouncement in the *Cooper & Nephews, Inc.*, case, *supra*, for classification thereof as a medicinal preparation under paragraph 5, *supra*, and dutiable as assessed by the collector. The close analogy between the treatment applied and the effect obtained by the Winthrop Chemical Co. to the chorionic gonadotropin hormone in the *Synthetic Patents Co., Inc.*, case, C. D. 816, *supra*, and the manipulation of the present merchandise by the same company makes equally applicable here our observation there, i. e., "that the laboratory work performed after importation did not change its therapeutic properties or enhance its medicinal value, but was merely a procedure followed for the benefit of the domestic manufacturer to make the imported hormone profitably marketable * * *."

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.