(C. D. 859)

BAYER CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 28, 1944)

*Eugene R. Pickrell (Eugene A. Chase of counsel) for the plaintiff.*
*Paul P. Rao, Assistant Attorney General (Richard F. Weeks and Robert C. O'Grady, special attorneys), for the defendant.*
*Lamb & Lerch (Kenneth G. Osborn of counsel) amicus curiae.*

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: Plaintiff, through its parent corporation, exercises exclusive control, obtained from letters patent (exhibit F), over cinnamyl ephedrine hydrochloride, the merchandise in question. It is a coal-tar product with therapeutic properties that impart some anaesthetizing effect and "powerful spasmolytic action." The product is never used alone, but is always associated with other therapeutic agents. Plaintiff employs it as an ingredient in two different products. With one, marketed under the label "Midol," it is mixed with aspirin and caffeine and advertised as a remedy "to relieve functional menstrual pains." With the other, "Chovanol," it is combined with cholic acid, rivanol, and oil of peppermint—each possessing individual medicinal properties—and offered as "a cholagogue," meaning "a product which will increase the production of bile." In neither of the commercial products does the therapeutic action of one ingredient affect any of the others.

These facts are undisputed in the present controversy which arises from assessment of the product by the collector under paragraph 28 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 28), and plaintiff's claim for classification under paragraph 27 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 27). The paragraphs in issue are as follows:

PAR. 28. Coal-tar products:

(a) All colors, dyes, or stains, whether soluble or not in water, except those provided for in subparagraph (b), color acids, color bases, color lakes, leuco-compounds, whether colorless or not, indoxyl, and indoxyl compounds; ink powders; photographic chemicals; acetanilide suitable for medicinal use, acet-phenetidine, acetylsalicylic acid, antipyrine, benzaldehyde suitable for medicinal use, benzoic acid suitable for medicinal use, beta-naphthol suitable for medicinal use, guaiacol and its derivatives, phenolphthalein, resorcinol suitable for medicinal use, salicylic acid and its salts suitable for medicinal use, salol, *and other medicinals;*

sodium benzoate; saccharin; artificial musk, benzyl acetate, benzyl benzoate, coumarin, diphenyloxide, * * * and other synthetic odoriferous or aromatic chemicals, * * *; synthetic phenolic resin and all resinlike products prepared from phenol, cresol, phthalic anhydride * * * or from any other article or material provided for in paragraph 27 or 1651, all these products whether in a solid, semisolid, or liquid condition; * * * and all mixtures, including solutions, consisting in whole or in part of any of the articles or materials provided for in this paragraph, excepting mixtures of synthetic odoriferous or aromatic chemicals, 45 per centum ad valorem and 7 cents per pound. [Italics ours.]

PAR. 27. Coal-tar products:

(a) (1) Acetanilide not suitable for medicinal use, * * * benzaldehyde not suitable for medicinal use, * * * benzoic acid not suitable for medicinal use, * * * beta-naphthol not suitable for medicinal use, * * * cinnamic acid, * * * resorcinol not suitable for medicinal use, salicylic acid and its salts not suitable for medicinal use * * *; all the foregoing products in this paragraph whether obtained, derived, or manufactured from coal-tar or other source;

* * * * * * *

(3) All products, by whatever name known, which are similar to any of the products provided for in this paragraph or in paragraph 1651, and which are obtained, derived, or manufactured in whole or in part from any of the products provided for in this paragraph or in paragraph 1651;

(4) all mixtures, including solutions, consisting in whole or in part of any of the foregoing products provided for in this paragraph, except sheep dip and medicinal soaps;

(5) all the foregoing products provided for in this paragraph, *not* colors, dyes, or stains, color acids, color bases, color lakes, leuco-compounds, indoxyl, indoxyl compounds, ink powders, photographic chemicals, *medicinals*, synthetic aromatic or odoriferous chemicals, synthetic resinlike products, synthetic tanning materials, or explosives, and not specially provided for in paragraph 28 or 1651, 40 per centum ad valorem and 7 cents per pound. [Italics ours.]

The collector regarded the instant merchandise as being within the provision for "other medicinals" in paragraph 28, *supra*. Plaintiff claims it is provided for in paragraph 27, *supra*, as a derivative of cinnamic acid, one of the products *eo nomine* designated therein.

Plaintiff's brief states that "there is no doubt that cinnamyl ephedrine hydrochloride comes within the provisions of paragraph 27 (a) (3). It is a product which is derived or manufactured in part from cinnamic acid, a product which is provided for by name in paragraph 27." Defendant's brief states: "A careful study of illustrative exhibit F in this case, United States Patent No. 1,959,392, will show that the merchandise at bar, viz, cinnamyl ephedrine hydrochloride, has been converted from cinnamic acid (paragraph 27) into cinnamylbromide and then subsequently combined with a well-known medicinal, ephedrine, to form cinnamyl ephedrine hydrochloride." While there is no direct testimony in the record confirming the immediately foregoing statements, our own study of the patent, which discloses the process followed in making cinnamyl ephedrine hydrochloride, seems to support such conclusions.

It is contended by plaintiff that paragraph 27, *supra*, is limited to

medicinal intermediates not susceptible of use by themselves but always combined with other therapeutic agents, and that the provision for "medicinals" in paragraph 28, *supra*, contemplates only finished products, capable *per se* of medicinal use.

The provisions of paragraphs 27 and 28, *supra*, were first enacted in the Tariff Act of 1922 (19 U. S. C. 1934 ed § 1001, par. 27 and par. 28). Much of the previous litigation concerning these two paragraphs has involved questions concerning the similarity and competitiveness of an imported coal-tar product with one manufactured or produced in this country, and the application of the American selling price of the domestic product as the proper basis for assessment of duty.

The question before us is different. The statutory construction raised herein has not been previously adjudicated, insofar as we have been able to determine. This is evidently due to the fact that from June 1922, when the paragraphs became effective, until January 1939, the merchandise under consideration had been classified under the provisions of paragraph 27, *supra*, as now contended by the plaintiff. Because of the change in attitude by the Bureau of Customs, as presented in T. D. 49799 (2), directing classification under paragraph 28, *supra*, this controversy has developed. In other words, plaintiff contends that the earlier classification, which prevailed until January 16, 1939, is the correct one.

The record consists of documentary proof as well as oral testimony. We have found particularly helpful, from a careful study thereof, the magazine article (illustrative exhibit E) entitled "The Effect of Cinnamyl Ephedrine on Smooth Muscle," published in the Journal of Pharmacology in 1940, and the letters patent (exhibit F) outlining the process for producing the imported product. The oral testimony was offered by two witnesses, one called by the plaintiff, and the other by the defendant.

Plaintiff's witness, a qualified research chemist, stated that a number of the products mentioned in paragraph 27, *supra*, are medicinal intermediates and that some of the *eo nomine* designations in paragraph 28, *supra*, are used by themselves as medicinals. Defendant's witness, apothecary-in-chief at New York Hospital with much experience in preparing prescriptions, disagreed with plaintiff's testimony in stating that benzaldehyde, benzoic acid, beta-naphthol, resorcinol, and guaiacol—all of which are provided for in paragraph 28—"are not used alone, speaking generally," in the compounding of prescriptions.

The contradiction in the testimony, however, does not affect the legal phase of the case which turns on the meaning to be given the term "medicinals," as it is used in the paragraphs under consideration. It is employed in paragraph 27, *supra*, to exclude therefrom a certain class of articles. In paragraph 28, *supra*, it appears in the

catch-all provision, "and other medicinals." Plaintiff argues that "if the provision for 'other medicinals' in paragraph 28 has no broader scope than the provision for 'all medicinal preparations' in paragraph 5, the correct decision is obvious." The said provision in paragraph 5 (19 U. S. C. 1940 ed. § 1001, par. 5) has been construed *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 98, C. D. 803) as being limited to finished products, with therapeutic properties, ready for medicinal use. The two provisions are not analogous. In paragraph 5, the word "medicinal" is an adjective, meaning "of or pertaining to medicine; adapted to heal or mitigate bodily diseases" (Funk & Wagnalls New Standard Dictionary). As such, it describes a particular kind of preparations or finished products. *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038. Paragraph 28 uses the word as a noun, defined in the said dictionary, as "any medicine or medicinal substance." This meaning is to be emphasized, in the light of the question before us, because obviously it includes not only medicinal products used alone, but also the intermediates. Hence, the ordinary meaning of the word as a noun—its form in the paragraphs under consideration—is not based on the manner or method of medicinal use, but rather on suitability for medicinal use. Since it is not alleged, nor has there been any attempt to show, that the term had a different commercial meaning, it therefore follows that the common meaning prevails.

The theory advanced by plaintiff is based on the assumption that there is an analogy between the tariff classification contemplated for non-coal-tar medicinal substances or commodities and coal-tar products. Plaintiff's brief states it this way:

It seems logical to assume that Congress intended to classify coal-tar medicinal preparations, their intermediates and their crudes, in a system analogous to that established for the non-coal-tar medicinal preparations. Whereas paragraph 5 provides for the non-coal-tar finished medicinal preparations used as such *per se*, or with only the addition of inert carriers, paragraph 28 provides for all finished coal-tar medicinals. Paragraph 34 provides for advanced drugs, which may be considered as medicinal intermediates. Likewise, paragraph 27 provides for coal-tar intermediates used in the preparation of coal-tar medicinals and other coal-tar products. The coal-tar crudes are free of duty under paragraph 1651, as the natural crude drugs are free of duty under paragraph 1669. Paragraph 28, however, employs more than one phraseology in referring to compounds having medicinal properties.

In this connection, it is important to observe that Congress has defined a drug, paragraphs 1669 (19 U. S. C. 1940 ed. § 1201, par. 1669) and 34 (19 U. S. C. 1940 ed. § 1001, par. 34), for tariff purposes, the principal element in the definition being that of "use," stated as follows: "the term 'drug' wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes." The same test of "use" is also applicable to invoke the provision for "medicinal preparations"

in paragraph 5, *supra.* *United States* v. *Wm. Cooper & Nephews, Inc.,* 22 C. C. P. A. 31, T. D. 47038.

In the *Synthetic Patents Co., Inc.,* case, *supra,* we distinguished between the tariff classifications for drugs, paragraphs 1669 and 34, *supra,* and medicinal preparations, paragraph 5, *supra,* holding that the former "connotes a substance or material useful for medicinal purposes," and the latter "a product, with therapeutic qualities, ready for medicinal use." Later, in *same* v. *same,* 11 Cust. Ct. 147, C. D. 813, the rule was applied in classifying cholic acid as an advanced drug, paragraph 34, *supra,* upon a showing that the merchandise was incapable of medicinal use by itself but required "compounding with a spasmolytic agent that also has definite medicinal qualities to correct the condition to be remedied." Such statutory construction has been followed in a series of recent cases, *same* v. *same,* 11 Cust. Ct. 157, C. D. 816, holding a protein hormone, known as chorionic gonadotropin, to be a medicinal preparation; *same* v. *same,* 12 Cust. Ct. 148, C. D. 845, involving tachysterol and vitamin $D_3$, sustaining the importer's claim of the former as an advanced drug, and upholding the collector's classification of the latter as a medicinal preparation; *same* v. *same,* 12 Cust. Ct. 158, C. D. 847, classifying "lipoid extract of brain" as a medicinal preparation; and *Roche-Organon, Inc.* v. *United States,* 12 Cust. Ct. 164, C. D. 848, holding an estrogenic hormone to be a medicinal preparation. In all of the said cases, the principle of "chief use" was adhered to.

The applicability of the tariff rule of "use" is totally hostile to the position taken by plaintiff. By statutory definition and judicial interpretation, as hereinabove set forth, the provisions for non-coaltar medicinals—paragraphs 5, 34, and 1669, *supra*—are limited, within other restrictions, to merchandise *chiefly used* for medicinal purposes. The plain and unambiguous language of paragraphs 27 and 28, *supra,* clearly indicates that the same principle does not apply to their judicial construction. The provisions thereof reflect a wider scope, so far as the present issue is concerned. Each of said paragraphs provides for acetanilide, benzaldehyde, benzoic acid, betanaphthol, resorcinol, salicylic acid and its salts, the distinction for classification under either being whether the products are "suitable for medicinal use." They are classifiable under paragraph 27, *supra,* if they are "not suitable for medicinal use"; they are embraced within the provisions of paragraph 28, *supra,* only if "suitable for medicinal use." *United States* v. *Lorsch & Co.,* 8 Ct. Cust. Appls. 109, T. D. 37222, held that "the term 'suitable for use' does not in the tariff sense imply or require chief use," the court stating that the words "imply a commercial suitability or fitness in the condition imported. *Klipstein* v. *United States* (1 Ct. Cust. Appls. 122; T. D. 31120)." In other words, it is a phrase of comparative broad application as

against the confined scope of predominant use, suggested by the statutory words "chiefly used."

The classifying distinction, based upon suitability for medicinal use, between certain coal-tar products *eo nomine* designated in paragraphs 27 and 28, *supra*, presents a guide for the statutory construction to be invoked in the present issue. Adoption by the legislators of such qualifying phrase suggests a purpose to make "suitable for use," as judicially construed, the criterion for tariff classification of all coal-tar products possessing therapeutic properties. In other words, the same principle which the statute expressly states is controlling of the designated coal-tar products with medicinal value shall also govern the classification of coal-tar medicinals not specially provided for.

The effect of this pronouncement is to attach broad application to the term "medicinals" as related to the products contemplated by said paragraphs 27 and 28, and thus give expression to the congressional intent, "to protect the domestic manufacturer of coal-tar products against similar competing foreign products, so that the domestic industry might become established" (*United States* v. *General Dyestuff Corp.*, 19 C. C. P. A. 410, T. D. 45577), later referred to in *Kuttroff Pickhardt & Co., Inc.* v. *United States* (21 C. C. P. A. 332, T. D 46864) in the following appropriate language:

> We have in mind the history of the times, prior to and on the date of the enactment of the provisions here under consideration, and what Congress sought to accomplish by the legislation, all of which is so generally known as to require no recital here.. It will be noted that the first words in said paragraphs 27 and 28 are "Coal-tar products:" and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs. A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish this purpose it named definitely a great number of articles and materials, and then, by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs.

The judicial interpretation, as hereinabove set forth, excludes the instant merchandise from paragraph 27, *supra*, under which classification is sought, and brings it within the general provision for "other medicinals" in paragraph 28, *supra*, as assessed by the collector.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.