SANDOZ CHEMICAL WORKS, Inc.

v.

UNITED STATES.

C. D. 1702; Protest No. 165378–K.

United States Customs Court
First Division.
May 19, 1955.

Eugene R. Pickrell, New York City (Eugene R. Pickrell and Michael Stramiello, Jr., New York City, of counsel), for plaintiff.

Warren E. Burger, Asst. Atty. Gen. (Joseph E. Weil, Trial Atty., New York City), for defendant.

Lamb & Lerch, New York City (John G. Lerch, New York City, of counsel), as amici curiae.

Before OLIVER, MOLLISON, and WILSON, Judges.

OLIVER, Chief Judge.

This case relates to merchandise described on the invoice as "homatropine hydrobromide" classified under paragraph 28(a) of section 1 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 28(a) which, so far as pertinent, reads as follows:

"Par. 28. Coal-tar products:

"(a) * * * acetanilide suitable for medicinal use, acetphenetidine, acetylsalicylic acid, antipyrine, benzaldehyde suitable for medicinal use, benzoic acid suitable for medicinal use, beta-naphthol suitable for medicinal use, guaiacol and its derivatives, phenolphthalein, resorcinol suitable for medicinal use, salicylic acid and its salts suitable for medicinal use, salol, *and other medicinals; * * * all the foregoing products* provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651 * * * 45 per centum ad.valorem and 7 cents per pound." [Italics added.]

At the trial, counsel for defendant explained that the collector's action invoking said paragraph 28(a) was based on the premise that the homatropine hydrobromide in question is a medicinal "obtained, derived, or manufactured in whole or in part" from a coal-tar product that is provided for in paragraph 1651.

Plaintiff makes several claims alleging classification for the present merchandise as an advanced drug, not specially provided for, dutiable at the rate of 5 per centum ad valorem under paragraph 34 of the Tariff Act of 1930, as amended by T.D. 51802, or as a medicinal preparation, not specially provided for, dutiable at 25 per centum ad valorem under paragraph 5 of the Tariff Act of 1930, or as a bromine compound, not specially provided for, dutiable at 10 cents per pound under paragraph 45 of the Tariff Act of 1930.

Twelve witnesses testified herein. Five appeared on behalf of the plaintiff and seven for the defendant. Although the record is quite voluminous, consisting of approximately 375 pages of testimony, we find it unnecessary to outline the testimony of each individual witness. Certain stipulated facts eliminate the necessity of reviewing in detail the highly technical testimony relating to the production and chemical composition of the present merchandise. In this connection, it has been agreed between the parties that the homatropine hydrobromide in question is a chemical compound; that it is "an ester of tropine and mandelic acid chemically combined with hydrobromic acid"; and that the "said mandelic acid is obtained, derived, or manufactured in part from toluene." Toluene, it will be noted, is a coal-tar product that is specifically provided for in paragraph 1651 of the Tariff Act of 1930. Thus, the primary question for determination is whether the homatropine hydrobromide under consideration is a "medicinal," as that term is to be construed within the provisions of paragraph 28(a), *supra*. If it is, and being a product "obtained, derived, or manufactured in whole or in part" from a product pro-

vided for in paragraph 1651, then the collector's classification must be sustained, because all the claims invoked by plaintiff are under residuary provisions that can be applied only if the merchandise in question is "not specially provided for".

The record is conclusive in showing that homatropine hydrobromide is chiefly used as a mydriatic and as a cycloplegic in connection with the examination of the eyes. As a mydriatic, homatropine hydrobromide has the effect of dilating the pupil of the eye so that the interior may be more completely examined, and, as a cycloplegic, it depresses the muscles of the eye to permit examination thereof.

In addition to its principal use as a mydriatic and a cycloplegic, homatropine hydrobromide is used by ophthalmologists "for the relief of intraocular pressure" in certain eye conditions. The said product is also employed to alleviate pain from peripheral vascular spasms "caused by over stimulation of the sympathetic or parasympathetic nerves that control the diameter of the blood vessels," and as a curative in the treatment of an intestinal disorder known as biliary dyskinesia. When used in the treatment of the two last-named conditions, homatropine hydrobromide is administered intravenously, intramuscularly, or orally.

Homatropine hydrobromide consists essentially of tropine and mandelic acid. The mandelic acid, comprising 42.4 per centum of the product, has therapeutic value and is used in the treatment of disease. As an active ingredient of homatropine hydrobromide, mandelic acid "alters the medicinal properties in certain or several characteristics from atropine."

Plaintiff claims that the chief use of the present merchandise as a mydriatic and a cycloplegic is not a medicinal use and, therefore, the commodity is not properly classifiable as a medicinal. In urging that the principle of chief use is controlling, counsel for plaintiff, in his brief, argues that the term " 'Medicinal' is a use designation within the provision of the Tariff Act, United States v. Wm.

Cooper & Nephews, Inc., 22 C.C.P.A., Customs, 31, T.D. 47038," and that "In order for an article to be classified under a use designation paragraph, the use which is the determinative factor, is *chief use*, United States v. Hempstead & Son, 3 Ct.Cust.App. 436, T.D. 33004, United States v. Boker & Co., 6 Ct.Cust. App. 243, T.D. 35472, Downing & Co. v. United States, 7 Ct.Cust.App. 287, T.D. 36802, Keller Co. v. United States, 13 Ct. Cust.App. 428, T.D. 41343, United States v. James P. Heffernan Paper Co., 17 C.C. P.A., Customs, 61, T.D. 43358, Knickerbocker Mills Co. v. United States, 11 Cust.Ct. 33, C.D. 788." [Italics quoted.]

The Wm. Cooper & Nephews, Inc., case, *supra,* construed the provision for "medicinal preparations" and, in holding chief use to be the controlling factor for classification thereunder, the court stated:

"In view of the fact that the Congress has required the application of the test of chief use to the drug paragraphs of the act, we can see no reason, so far as the test of use is concerned, for not applying the same test to the provision for medicinal preparations contained in paragraph 5. See Monticelli Bros. v. United States, 8 Ct.Cust.App. 21, T.D. 37162. Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal. * * *"

In all of the other cases, hereinabove set forth, as cited in plaintiff's brief, except the Downing & Co. case, the principle of chief use was held to apply to the particular tariff provisions under discussion therein. The Hempstead & Son case involved a provision for "jute-manufacturing machinery"; the Boker & Co. case construed the provision for agricultural implements; the Keller Co. case involved the provision for paper stock; the Heffernan Paper Co. case construed the provision for standard newsprint paper;

and the Knickerbocker Mills Co. case involved a provision for "all articles of vegetable origin used for * * * coloring." In the Downing & Co. case, the court held, without discussing the principle of chief use, that the provision for sugar-manufacturing machinery did not include a machine used for making chocolate.

While it can be said as a general proposition, as argued by plaintiff, that a tariff provision predicated upon the use of merchandise makes chief use the determinative factor for classification purposes, such a judicial interpretation does not apply in the present issue involving, as it does, the broad and comprehensive provisions of paragraph 28(a). The statutory construction invoked in the case of Bayer Co., Inc. v. United States, 13 Cust. Ct. 6, C.D. 859, is also controlling herein. There, the merchandise consisted of cinnamyl ephedrine hydrochloride, a coal-tar product with therapeutic properties. The product was never used alone but was always associated with other therapeutic agents in two commercial products marketed under the label "Midol" and "Chovanol." The collector classified the imported substance under the general provision for "other medicinals" in paragraph 28, supra. Plaintiff claimed classification under paragraph 27 of the Tariff Act of 1930 as a derivative of cinnamic acid, one of the products eo nomine designated therein. The case turned on an interpretation of the term "medicinals," as it appears in the context of the provisions of said paragraphs 27 and 28. In holding "suitable for medicinal use" to be controlling of classification as a medicinal under paragraphs 27 and 28, the court reasoned as follows:

"The applicability of the tariff rule of 'use' [chief use] is totally hostile to the position taken by plaintiff. By statutory definition and judicial interpretation, as hereinabove set forth, the provisions for non-coal-tar medicinals—paragraphs 5, 34, and 1669, supra—are limited, within other restrictions, to merchandise chiefly used for medicinal purposes. The plain and unambiguous language of paragraphs 27 and 28, supra, clearly indicates that the same principle does not apply to their judicial construction. The provisions thereof reflect a wider scope, so far as the present issue is concerned. Each of said paragraphs provides for acetanilide, benzaldehyde, benzoic acid, beta-naphthol, resorcinol, salicylic acid and its salts, the distinction for classification under either being whether the products are 'suitable for medicinal use.' They are classifiable under paragraph 27, supra, if they are 'not suitable for medicinal use'; they are embraced within the provisions of paragraph 28, supra, only if 'suitable for medicinal use.' United States v. Lorsch & Co., 8 Ct.Cust. App. 109, T.D. 37222, held that 'the term "suitable for use" does not in the tariff sense imply or require chief use,' the court stating that the words 'imply a commercial suitability or fitness in the condition imported. Klipstein v. United States, 1 Ct.Cust.App. 122, T.D. 31120.' In other words, it is a phrase of comparative broad application as against the confined scope of predominant use, suggested by the statutory words 'chiefly used.'

"The classifying distinction, based upon suitability for medicinal use, between certain coal-tar products eo nomine designated in paragraphs 27 and 28, supra, presents a guide for the statutory construction to be invoked in the present issue. Adoption by the legislators of such qualifying phrase suggests a purpose to make 'suitable for use,' as judicially construed, the criterion for tariff classification of all coal-tar products possessing therapeutic properties. In other words, the same principle which the statute expressly states is controlling of the designated coal-tar products with medicinal value shall also govern the classification of

coal-tar medicinals not specially provided for." [Italics quoted.]

In holding, as we do, that "suitable for medicinal use" is applicable in the classification of medicinals under said paragraph 28(a), our conclusion is consistent with the reasoning followed in Kuttroff, Pickhardt & Co. (Inc.) v. United States, 13 Ct.Cust.App. 203, T.D. 41054, which held that the principle of chief use did not apply in the classification of coal-tar dyes, under paragraph 28 of the Tariff Act of 1922, which was the predecessor to paragraph 28 of the Tariff Act of 1930, the subject of the present controversy. In that case, the court said:

"Keeping in mind the stated purpose of Congress in enacting the Tariff Act of 1922, which was 'To provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes,' the task before us is not one of difficult proportions. It seems to us that Congress has provided that any domestic dye shall, for the purposes of this paragraph, be considered similar to or competitive with any imported dye, if, when applied in substantially the same manner to articles or materials for which both dyes are commercially suitable, the imported dye accomplishes results substantially equal to those accomplished by the domestic dye.

"To hold that Congress intended that, in order to determine whether such dyes were similar or competitive, they should be applied to articles or materials for which such dyes are chiefly used in the commerce of the United States, would defeat the evident purpose of Congress. It seems incredible that Congress, with the intention of encouraging the development of the dye industry in the United States, should require that such industry should be developed and its products actually sold in the markets of the United States in competition with imported dyes, before adequate protection would be afforded. A mere statement of the proposition is sufficient to show its absurdity."

That the homatropine hydrobromide in question is suitable for medicinal use is amply supported by the record, as hereinabove set forth, and since it is conceded that the product is obtained, derived, or manufactured in part from toluene, a coal-tar product that is specifically provided for in paragraph 1651, the present merchandise is within the class of products contemplated by said paragraph 28(a), as classified by the collector.

The broad interpretation applied herein to the provisions of paragraph 28(a) gives expression to the congressional intent "to protect the domestic manufacturer of coal-tar products against similar competing foreign products, so that the domestic industry might become established" (United States v. General Dyestuff Corp., 19 C.C.P.A., Customs, 410, T.D. 45577), later referred to in Kuttroff, Pickhardt & Co., Inc. v. United States, 21 C.C.P.A., Customs, 332, T.D. 46864, in the following appropriate language:

"We have in mind the history of the times, prior to and on the date of the enactment of the provisions here under consideration, and what Congress sought to accomplish by the legislation, all of which is so generally known as to require no recital here. It will be noted that the first words in said paragraphs 27 and 28 are 'Coal-tar products:' and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs. A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish

this purpose it named definitely a great number of articles and materials, and then, by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs."

The foregoing quotation was cited with approval in the recent decision of the Court of Customs and Patent Appeals in the case of United States v. Esso Standard Oil Co., 41 C.C.P.A., Customs, 171, C.A.D. 546, wherein a resinlike substance, containing styrene, which was obtained, derived, and manufactured in part from benzene, a coal-tar product provided for in paragraph 1651, was held to be classifiable under paragraph 28(a).

■ It is a well-settled principle that "The master rule in the construction of statutes is to so interpret them as to carry out the legislative intent." United States v. Clay Adams Co., Inc., 20 C.C.P.A., Customs, 285, T.D. 46078. That intent has been judicially enunciated in the cases cited herein and which have been followed in the statutory construction invoked. Hence, there is no need for discussion of other rules of statutory construction which are to be applied only as aids in the ascertainment of the intention of the lawmakers and not for the purpose of subverting such intention when ascertained. Mid-Northern Oil Co. v. Walker, 268 U.S. 45, 49, 45 S.Ct. 440, 69 L.Ed. 841.

The case of J. B. Roerig and Co. v. United States, 26 Cust.Ct. 131, C.D. 1313, cited in plaintiff's brief to support the contention that homatropine hydrobromide is not a medicinal under paragraph 28(a), supra, is distinguishable from the present case. There, the merchandise consisted of so-called darthronol and heptuna capsules that possessed therapeutic properties and were exclusively used for medicinal purposes. Because the coal-tar derivatives contained therein supplied none of the therapeutic properties of the capsules, but served only as "dietary foods, useful for nutritional value only," the merchandise was excluded from classification as coal-tar medicinals under said paragraph 28(a). The same factual condition is not present in this case. Here, the mandelic acid, which is the coal-tar derivative in the homatropine hydrobromide under consideration, is an essential component thereof. Homatropine hydrobromide, concededly a chemical compound, is produced by reacting tropine with mandelic acid in the presence of a small amount of hydrochloric acid. Tropine and mandelic acid are essential ingredients of the finished product, and, from the compounding of the two components, homatropine hydrobromide acquires the therapeutic properties necessary for its medicinal uses.

■ Counsel for plaintiff, in his supplemental brief, refers to certain legislative history to support the contention that the principle of "chief use" should be applied in construing the provisions for "other medicinals" in paragraph 28 (a), supra. In this connection, counsel quotes recommendations made to Congress in 1916 by a chemical expert on the staff of the Tariff Commission and also refers to the Summary of Tariff Information of 1921. In the light of the judicial interpretation of paragraph 28 (a), as enunciated in the cases hereinabove cited, there is no reason under the present issue for resorting to the extrinsic aid suggested by plaintiff. It is well settled that "extrinsic aid properly may be invoked only after ambiguity has been found to exist; or, to state it differently, it is not proper to invoke extrinsic aid and thereby create ambiguity." United States v. Kung Chen Fur Corporation, 188 F.2d 577, 584, 38 C.C.P.A., Customs, 107 C.A.D. 447.

For all of the reasons hereinabove set forth, all of the claims in the protest are overruled, and the decision of the collector is affirmed. Judgment will be rendered accordingly.

MOLLISON, Judge (dissenting).

I regret that I cannot concur in either the reasoning or the conclusion reached by my associates in this case, and, in so doing, I wish particularly to express my

dissent from the view adopted by the majority that in the interpretation of the language used in paragraph 28(a) a "broad application" is necessary in order to give proper expression to the congressional intent. As I understand the majority opinion, a "broad" view is taken of the term "medicinals," as found in paragraph 28(a), as a result of which there is included thereunder a substance which, by implication, the majority has found would otherwise not be included.

I take note of the provisions of subparagraph (i) of the said paragraph, requiring classification under the coal-tar paragraphs of articles which are within the terms of the said paragraphs, as well as of paragraphs 1, 5, 37, 39, 60, 66, 82, or 1687, and I conceive this to be the limit of statutory direction with respect to classification of imported merchandise covered by those paragraphs.

I do not find any legislative intent otherwise made manifest, either expressly or by necessary implication, which would require the making of an interpretation of the language of the paragraph so as to include therein anything which does not take classification thereunder either directly or by similitude or by the application of the ordinary rules of statutory construction.

The primary issue is simply stated: Is homatropine hydrobromide a medicinal within the meaning of that term as used in paragraph 28(a), *supra?*

In assuming the negative of the issue thus stated, the plaintiff contends that the term "medicinal," as used in paragraph 28(a), is a designation by use and is subject to the well-settled rule of customs law that where use is made the test of classification, it is the chief use of the article or substance that controls. I do not understand that there is any question but that the term "medicinals" is a designation by use, and, as the word "use" or a derivative thereof is not contained therein, it is that type of use designation which has been called an *eo nomine* designation by use, or suggesting use.

Citing various lexicographic and judicial authorities, plaintiff contends that the term "medicinal" is limited to those articles or substances chiefly used for the prevention, cure, or alleviation of disease. The majority has found, and I agree, that the record shows that the chief use of homatropine hydrobromide is as a mydriatic and a cycloplegic in connection with the examination of the eyes. In my view, the record also shows conclusively that in such use it is used as a diagnostic material and performs no preventive, curative, or alleviative function. I would, therefore, find that the chief use of homatropine hydrobromide is not as a medicinal.

The majority has held, however, based upon a construction of the term "medicinals," as found in paragraph 28(a), *supra,* first advanced in the case of Bayer Co., Inc. v. United States, 13 Cust.Ct. 6, C.D. 859, that because Congress used the term "suitable for medicinal use" in connection with six of the twelve named substances which in series precede the more general language "and other medicinals" in paragraph 28(a) the legislators evinced a purpose to embrace within the term "medicinals" any substance having preventive, curative, or alleviative use in the treatment of disease, even though such use be not the chief use of the substance.

This interpretation of the general term as embracing substances of the same class or general nature as the particular substances which are modified by the term "suitable for medicinal use" is not stated to be based upon the application of the rule of statutory construction, known as *ejusdem generis,* but is based, apparently, upon a concept of the coal-tar provisions of the tariff act as being *sui generis* and subject to a broader interpretation than that to which other paragraphs of the act are submitted. As I have said, I do not subscribe to such a concept of the coal-tar provision.

I do not deem it necessary at this point to discuss the question of whether the rule of *ejusdem generis* is properly involved in the matter before us, because

I believe that the record and prior judicial authority otherwise establish that the substance here involved, homatropine hydrobromide, is not properly classifiable under paragraph 28(a), *supra*.

In a case decided subsequent to the Bayer case, cited by the majority this division of the court held that the term "medicinals," as used in paragraph 28(a) of the Tariff Act of 1930, was limited to those substances in which the coal-tar element or elements supplied the therapeutic properties which characterized a substance as medicinal. See J. B. Roerig and Co. v. United States, 26 Cust.Ct. 131, C.D. 1313.

As I read the record in the case at bar, I conclude that the element which supplies the therapeutic properties of homatropine hydrobromide, not only in its chief use as a mydriatic and a cycloplegic, but also in its minor use in the cure of biliary dyskinesia or the alleviation of pain in peripheral vascular spasm, is atropine, which the evidence clearly establishes to be of non-coal-tar origin. The function of the mandelic acid, which is the coal-tar derivative contained in homatropine hydrobromide, is shown to be in the reduction of the toxicity of the atropine and to make its effect less lasting, or as a "control," as expressed by the majority in its opinion herein. The mandelic acid, therefore, does not contribute any therapeutic properties which it possesses, whatever they may be, to the medicinal use of homatropine hydrobromide. Under the principles expressed in the Roerig case, therefore, homatropine hydrobromide is not a medicinal within the meaning of that term, as used in paragraph 28(a).

There is, to my mind, another reason why the merchandise does not take classification under paragraph 28(a) as a "medicinal." As has been said, the term "medicinal" is an *eo nomine* designation by use, or suggesting use. It appears that homatropine hydrobromide was known to commerce at and prior to the effective date of the Tariff Act of 1930, i. e., June 17, 1930, in paragraph 28(a) of which the term "medicinals" appears. In such cases, it is the use of the merchandise at the time of the passage of the act in which the classification term appears which controls. The record clearly shows that the minor uses, and the only truly medicinal uses of homatropine hydrobromide, in the cure of biliary dyskinesia and in the alleviation of pain in peripheral vascular spasm began experimentally in 1936 and regularly in 1940. It follows, therefore, that the *sole* use of homatropine hydrobromide at or about June 17, 1930, when the Tariff Act of 1930 was enacted, was as a mydriatic and cycloplegic, which use is nonmedicinal. See Wilbur-Ellis Co. v. United States, 18 C.C.P.A., Customs, 472, T.D. 44762, and Goldsmith's Sons v. United States, 13 Ct.Cust.App. 69, T.D. 40932, cited therein, for a discussion as to the controlling dates in cases of *eo nomine* designations, as distinguished from designations where the word "use" is employed.

As the chief use of the merchandise at bar is for other than prevention, cure, or alleviation of disease, it is not classifiable under the provision in paragraph 5 for medicinal preparations. It is not classifiable under paragraph 34 as an advanced drug, for the reason that the record shows it to be compounded. It is shown to be both a chemical compound and a bromine compound, the former dutiable under paragraph 5, and the latter under paragraph 45. Since "bromine compounds" is a more specific designation than "chemical * * * compounds," clearly the merchandise should take classification under paragraph 45, as claimed by the plaintiff.