(C. D. 1999)

CIBA PHARMACEUTICAL PRODUCTS, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 28, 1958)

*Eugene R. Pickrell* (*Richard F. Weeks* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.
*Barnes, Richardson & Colburn* (*James F. Donnelly* of counsel) as *amicus curiae.*

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise at bar, invoiced as "2-BENZYL-4:5-IMIDAZOLINE HYDROCHLORIDE," was classified at the rate of 45 per centum ad valorem and 7 cents per pound under paragraph 28 (a) of the Tariff Act of 1930 as a coal-tar medicinal.

Plaintiff claims the merchandise should be classified under paragraph 5 of the Tariff Act of 1930 at the rate of 25 per centum ad valorem as a "medicinal preparation, not specially provided for," or, alternatively, under paragraph 34 of the said act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, at the rate of 5 per centum ad valorem as a "drug advanced." Plaintiff relies principally on its claim for classification under paragraph 5, *supra.* The product in question is known in commerce as "Priscoline hydrochloride" and will be referred to hereinafter as "Priscoline."

The pertinent portions of the Tariff Act of 1930 herein involved provide as follows:

[Paragraph 28 (a)]:

    * * * acetanilide suitable for medicinal use, * * * salol, and other medicinals; * * * all the foregoing products provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651; * * * 45 per centum ad valorem and 7 cents per pound.

[Paragraph 5]:

    All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the fore-

going obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

Attention is here directed to the fact that paragraphs 27 and 1651 of the Tariff Act of 1930, referred to in paragraph 28, also provide for the classification of "Coal-tar products" and that toluene, a distillate of coal tar, is designated *eo nomine* in paragraph 1651.

There is no dispute as to the constituent parts of Priscoline, nor as to its method of manufacture, the process employed in its production being substantially as follows:

The beginning materials are benzyl cyanide and anhydrous ethylene diamine, which are reacted in the presence of catalytic quantities of carbon disulfide. In the process, ammonia splits off, leaving the 2-benzyl-4:5-imidazoline base. After this latter material is distilled in vacuum and dissolved in alcohol, it is filtered with charcoal. The base is then converted into 2-benzyl-4:5-imidazoline hydrochloride by mixing it with hydrogen chloride. In the production of Priscoline, therefore, two chemical reactions take place. First, that between the benzyl cyanide and the anhydrous ethylene diamine; and, second, between the 2-benzyl-4:5-imidazoline base and hydrogen chloride. Benzyl cyanide, one of the beginning substances, is derived from toluene, which is admitted to be a coal-tar derivative. Toluene is obtained by a fractional distillation of bituminous coal, a natural product. Ethylene diamine, the other beginning substance, is a non-coal-tar product, the ethylene being derived from a natural gas.

The testimony of plaintiff's witness, Dr. Robert S. Miner, Jr., indicates that the constituent parts of the final product, Priscoline, consist of a phenyl radical, which is coal-tar in origin, a methylene group, an imidazoline radical, and hydrogen chloride. While the methylene group, in some instances, may be derived from non-coal-tar sources, yet, the methylene group in the imported Priscoline of necessity came from a coal-tar source, as appears from the following testimony by Dr. Miner:

Q. Well, if you say it comes from the toluene, why do you say it's non-coal tar?—A. The benzyl cyanide, of course, is derived from other sources, as well as toluene, and the methylene group admittedly can come from the toluene. But necessarily does it? I don't know.

Q. Well, in this reaction that he has here in which he combines benzyl cyanide and ethylene diamine, where else could that $CH_2$ come from?—A. No other place. [R. 23.]

It appears, therefore, that the final product, Priscoline, consists of a phenyl radical, admittedly a coal-tar product; a methylene group which was derived from toluene, concededly a coal-tar substance; an imidazoline radical of non-coal-tar origin; and hydrogen chloride, which is a non-coal-tar product. On the indicated analysis, Dr.

Miner classified the Priscoline as an imidazoline derivative, principally non-coal tar from a chemical point of view (R. 28). The witness testified that the products enumerated in paragraph 28 (a), *supra*, are principally coal-tar products, but that they are different from Priscoline in that none of them is an imidazoline derivative. They do not contain the imidazoline ring (R. 28–30). Dr. Miner gave the percentages by weight of the constituent parts of Priscoline as follows: The phenyl radical 39.2 percent; the imidazoline ring 35.1 percent; the methylene group 7.1 percent; and the hydrogen chloride 18.6 percent. The percentage by weight, therefore, of the two coal-tar derivatives, the phenyl radical and the methylene group, is 46.3 percent.

The uncontroverted testimony of Dr. J. Cambell Howard, Jr., and Dr. Andrew G. Prandoni, two medical doctors called by the plaintiff, is, in substance, to the effect that Priscoline is a medicinal used for the treatment of "various peripheral vascular conditions that are associated with arterial vascular spasm" and is "a vasodilating compound, something that will relax the spasm and dilate the vessels" (R. 65). The witnesses further testified that histamine is also a vasodilator, used therapeutically for the same purpose as Priscoline, except that the effect produced by the administration of histamine is of very short duration, requiring a constant dripping of the histamine into the system by injection for its effectiveness; that, unlike the imported product, histamine cannot be administered by mouth, whereas Priscoline can be and is effective for a considerable period of time. According to the doctors' testimony, histamine, as well as other medicinals used as vasodilators, is an imidazoline derivative and Priscoline's therapeutic value stems from its imidazoline radical. However, under cross-examination, the doctors admitted that there are imidazoline derivatives, used as medicinals, which are vascular constrictors, that is, they produce the opposite effect to that which results from the administration of histamine and Priscoline.

All the witnesses called by the plaintiff agreed that the substances enumerated in paragraph 28 (a), *supra*, are not used for the same purposes; that while none of them are used as vasodilators, they are all used in various ways for the treatment of diseases (R. 78–79).

On cross-examination, Dr. Howard agreed with the statement contained in "The Pharmacological Basis of Therapeutics," by Goodman and Gilman, to the effect that all drugs may be divided into two categories: First, those that act upon the patient, that is, pharmacodynamic agents; and, second, those which destroy parasites, or chemotherapeutic agents. He further stated that some of the substances named in paragraph 28 (a) could be listed under both of these

headings and the balance under one or the other; that Priscoline is a pharmacodynamic agent; that antistine hydrochloride, which has the same imidazoline structure as Priscoline hydrochloride, is an antihistamine, being neither a vasodilator nor a vasoconstrictor. He also admitted that there is a chemical compound known as "Imidazole," but that, taken alone, it has no therapeutic properties known to him, although it contains the imidazole or imidazoline ring structure.

Plaintiff, in the case at bar, contends that the imported Priscoline is not classifiable under the provisions of paragraph 28 (a), *supra*, because it is not *ejusdem generis* with the coal-tar medicinals designated *eo nomine* in the aforesaid paragraph, which medicinals precede the general phrase contained therein "and other medicinals." Defendant and *amicus curiae* herein contend, on the other hand, that the principle of *ejusdem generis* has no application to the facts in this case and that the product at bar is properly dutiable as classified.

Counsel for plaintiff, in their brief, stress the fact that the words "and other medicinals" in paragraph 28 (a), *supra*, follow a list of medicinals designated by name; that such words are not used in connection with "a number of classes of coal-tar chemicals such as dyes, photographic chemicals, rubber accelerators, perfume materials, and others," and that the naming of this latter group of chemicals is followed by the language "all the foregoing products provided for in this paragraph, when obtained, derived, or manufactured·in whole or in part from any of the products provided for in paragraph 27 or 1651 * * * ." Plaintiff contends, therefore, that the word "other," as used following the enumerated medicinals in the pertinent paragraph, has a definite meaning; that "It limits or explains. Its modifying force may apply to that which *precedes* the word 'other,' * * * or to that which *follows* the word 'other,' * * *." [Italics quoted.] In this connection, our attention is directed to the cases of *United States* v. *Sydney Kann & Co.*, 20 C. C. P. A. (Customs) 77, T. D. 45702, and *California Oil Co.* v. *United States*, 29 Cust. Ct. 44, C. D. 1442.

In the *Sydney Kann* case, *supra*, the merchandise involved consisted of certain mechanical pencils with cigar lighter attachments, the pencils having the ordinary clips for holding the articles in the pocket. The merchandise was classified under paragraph 1527 of the Tariff Act of 1930 providing for:

Articles valued above 20 cents per dozen pieces, designed to be worn on apparel or carried on or about or attached to the person, such as and including * * * cigar lighters * * * and like articles * * *

and was claimed to be properly classifiable under paragraph 1550 (c) of the Tariff Act of 1930 as—

Mechanical pencils, 45 cents per gross and 40 per centum ad valorem.

The court, in the cited case, held that *all* subparagraphs of paragraph 1550 of the tariff act dealt with articles relating to the art of writing, and that a fair construction of the words "other attachments" in subparagraph (a) of paragraph 1550 was that such attachments must be *ejusdem generis* with "rubber erasers and automatic stamps when combined with the penholders therein described. We are unable to agree that cigar lighters meet this test."

In the case at bar, all the named substances preceding the words "and other medicinals" are conceded to be "medicinals," and we have here a factual situation entirely different from that in the *Kann* case, *supra*, where in effect it was held that cigar lighters were not such like articles or attachments as erasers, etc. The *Kann* case, *supra*, is not applicable to the case at bar.

The merchandise involved in the *California Oil Co.* case, *supra*, was invoiced as "Blending Gasoline" and was admitted free of duty. However, a revenue tax of 1¼ cents per gallon was assessed on the product under the Internal Revenue Code providing for such a levy on—

\* \* \* gasoline or other motor fuel \* \* \*.

The importer claimed that the blending gasoline was subject to a tax of one-fourth of 1 cent per gallon only under the same section providing for liquid derivatives of crude petroleum, except certain named derivatives, including gasoline or other motor fuel. The court found that the chief use of the involved merchandise was other than as a motor fuel and that it was not properly assessed with tax under the Internal Revenue Code under the provision for "gasoline or other motor fuel." On the question of the construction of the word "other," the court said:

The word "other" as used in statutes such as that here involved has a modifying force, in the sense of limitation or explanation, and it may apply that force to that which precedes it or to that which follows it. \* \* \* If the modifying force of the word be applied to that which precedes it, i. e., "gasoline," then the word "gasoline" as used in the statute would include only such gasoline as is of the kind and character of motor fuel. If, on the other hand, the modifying force be applied to that which follows it, i. e., "motor fuel," then the words "motor fuel" would include only such motor fuel as is of the kind and character of gasoline.

The court, accordingly, held that, in either case, the reference was to gasoline intended for chief use as a motor fuel or in terms of motor fuel.

In the instant case, the word "medicinal" is a use designation (see *Sandoz Chemical Works, Inc.* v. *United States*, 43 C. C. P. A. (Customs)

152, C. A. D. 623), and whether the word "other" is construed to modify the designated "medicinals" which precede it or the word "medicinals" which follows it makes no difference since, in any event, we are concerned with "medicinals," and with "medicinals" which are derived in whole or in part from a coal-tar product.

In further support of its argument that Priscoline must be excluded from the terms of paragraph 28 (a), *supra*, because it is not *ejusdem generis* with the named medicinals therein, counsel for plaintiff argues that the substances designated in that paragraph differ both in chemical composition and in use from Priscoline. Plaintiff further contends that since a coal-tar product is not the dominant element in Priscoline, it cannot be held to be included in the meaning of the words "other medicinals" contained in paragraph 28 (a), since that provision provides for the classification of coal-tar products only. In support of this proposition, plaintiff cites the case of *Magnus* v. *United States*, 1 Ct. Cust. Appls. 166, T. D. 31212.

In the *Magnus* case, *supra*, decided in 1911, the merchandise consisted of artificial musk classified under paragraph 3 of the Tariff Act of 1897 as a chemical compound, not specially provided for. The importer claimed the merchandise classifiable under paragraph 15 of that act for "Coal-tar dyes or colors, not specially provided for in this Act, * * * all other products or preparations of coal tar, not colors or dyes and not medicinal, not specially provided for in this Act, * * *." In holding that the involved product was not classifiable as claimed, the court, at page 167, stated:

* * * aside from any quantitative predominance in order to bring the article within purview of that statute it should be shown by the party holding the affirmative that coal tar was a dominating element to the extent that the efficiency, or at least the dominating characteristic, of the imported merchandise was derived from coal tar. In this case such proof is not made in the record.

The court cited with approval the following statement from *In re Roessler & Hasslacher Chemical Co.* (49 Fed. 272), and affirmed in the same case (56 Fed. 481):

Nor is it particularly material that other substances have been added, if the *determining characteristic of the product or preparation* is something which it has received from coal tar * * *. [Italics quoted.]

It seems clear that the *Magnus* case, *supra*, is not controlling in the case before us. Under paragraph 15 of the Tariff Act of 1897, there was no provision for preparations derived in part only from coal tar, and, admittedly, the benzyl cyanide utilized to produce Priscoline is a derivative of a coal-tar product, toluene, enumerated in paragraph 1651. Further, there was no provision for medicinals in the paragraph involved in the *Magnus* case, *supra*.

The case of *United States* v. *C. J. Tower & Sons*, 44 C. C. P. A. (Customs) 1, C. A. D. 626, is of some help in our present determination. The issue there presented was whether certain limestone slabs, suitable for use as monumental or building stone, were "hewn, dressed, or polished, or otherwise manufactured" (paragraph 234 (c), Tariff Act of 1930), or were "unmanufactured, or not dressed, hewn, or polished," under the same paragraph of the act. It appeared the stone was quarried in large, heavy, rectangular blocks, weighing 10 to 15 tons. These blocks were sawn by gangsaws into slabs. Upon the sawn surfaces were numerous small ridges, resulting from the sawing operation. The slabs were 2⅝ to 8 inches thick, with some stock slabs being 9, 10, 11, and 12 inches thick. The court therein, discussing the rule of *ejusdem generis,* page 5, stated:

The rule of *ejusdem generis* (where particular words of description are followed by general terms, the latter refer only to things of a like class with those particularly described) is a well known rule of construction, often used by this court, to aid in arriving at the legislative intent of Congress, which, of course, is the ultimate consideration in the construction of tariff statutes. The rule is primarily designed to preserve the meaning of the particular words as well as to give to the general words an interpretation consistent with the manifest purpose of the entire act. *Overton & Co.* v. *United States,* 2 Ct. Cust. Appls. 422, T. D. 32172. The latter purpose subserves an even more fundamental purpose of giving effect, if possible, to *all* words in a statutory provision, since the legislature is not presumed to have used superfluous words. 2 SOUTHERLAND [*sic*], STATUTES AND STATUTORY CONSTRUCTION § 4909, at 398 (3rd ed. 1943); *Carey & Skinner, Inc.* v. *United States,* 42 C. C. P. A. (Customs) 86, C. A. D. 576.

However compelling the foregoing considerations may appear, it is equally well established that the rule of *ejusdem generis* is inapplicable where general words are associated with specific designations of unlike genera. In such an instance, the general words are deemed to remain unaffected by their association with the specific designations. 2 SUTHERLAND, *supra,* § 4912. [Italics quoted.]

The court then pointed out that since the general words "or otherwise manufactured" followed the more specific words "hewn," "dressed," and "polished," and since each of the latter words referred to different degrees of treatment, there was no characteristic common to all of them from which could be inferred an intention on the part of Congress to restrict the effect of the general provision to any particular class of conditions and that, accordingly, the principle of construction known as *ejusdem generis* had no application.

In the case of *Kuttroff, Pickhardt & Co., Inc.* v. *United States,* 21 C. C. P. A. (Customs) 332, T. D. 46864, at page 339, our appellate court, after affirming the master rule of statutory construction to be "to ascertain the legislative intent," made the following statement:

\* \* \* It will be noted that the first words in said paragraphs 27 and 28 are "Coal-tar products:" and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs.

A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish this purpose it named definitely a great number of articles and materials, and then by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs. * * *

The case of *Sandoz Chemical Works, Inc.* v. *United States, supra,* in our opinion, is in point in deciding the case at bar. In the *Sandoz* case, the importation consisted of a material known by the name of homatropine hydrobromide, used by ophthalmologists as a mydriatic, and also used in the treatment of peripheral vascular spasms. The merchandise was classified under paragraph 28 (a) of the Tariff Act of 1930 as a medicinal and was claimed by plaintiff to be more specifically provided for under paragraph 45 of said act as "Bromine and all bromine compounds not specially provided for." The parties stipulated that the involved product was "an ester of tropine and mandelic acid chemically combined with hydrobromic acid, and that the mandelic acid is obtained, derived, or manufactured in part from toluene," which latter was admittedly a coal-tar product provided for under paragraph 1651 of the Tariff Act of 1930, which paragraph 1651 is referred to in paragraph 28 (a) of the same act.

The Government, in the *Sandoz Chemical Works, Inc.,* case, *supra,* argued that Congress intended the term "other medicinals" to embrace all medicinals, if composed in whole or in part of any of the coal-tar substances provided for in paragraph 27, 28, or 1651 of the Tariff Act of 1930. It was further contended that the term "medicinals" is a use designation and that a use designation is more specific than a class designation. Our appellate court, stating that a designation by specific use prevails over a description of general character without special limitation as to use or other qualification, held that the material in question was more specifically provided for under paragraph 28 (a) as a medicinal than under the provisions of paragraph 45 for "Bromine and all bromine compounds not specially provided for." The same principle applies in the instant case, since the descriptions in paragraph 5 are general covering "all medicinal preparations * * * not specially provided for."

It is conceded that Priscoline is a medicinal and that it is in part manufactured from a derivative of toluene, a coal-tar substance. The true test of whether Priscoline is properly classifiable under paragraph 28 (a) of the Tariff Act of 1930 is *not,* therefore, whether a coal-tar product gives Priscoline its dominating characteristic as a medicinal, but whether it is derived in whole or in part from a product provided for under the terms of paragraph 28 (a), or paragraph 27 or 1651, of the Tariff Act of 1930, its use as a medicinal being conceded.

The plaintiff places great stress upon the claim that the coal-tar derivative used in the manufacture of Priscoline does not give it its value as a medicinal when used as a vasodilator, but that its therapeutic effect is derived from the imidazoline radical similar to that found in histamine, a non-coal-tar product. However, in our opinion, the rule set forth in the case of *Plant Products Corporation* v. *United States*, 44 C. C. P. A. (Customs) 183, C. A. D. 658, is applicable. The merchandise there involved consisted of an insecticidal compound known as Parathion. The importer contended that the product was not properly classifiable under paragraph 27 of the Tariff Act of 1930 as a coal-tar product because the effectiveness of the material as an insecticide was derived from some other source than its coal-tar element. The court held, however, that the molecule as a whole determined the effectiveness of the product rather than any one of its constituent parts. In the case at bar, the plaintiff contends that the imidazoline part of Priscoline gives it its therapeutic value, yet the evidence shows that the chemical imidazole alone has no known medicinal use. The evidence also shows that some imidazoline products are used for entirely different purposes than histamine (an imidazoline product) and Priscoline. The testimony is also clearly to the effect that while histamine and Priscoline are used for the same general purpose as vasodilators, yet Priscoline can be administered effectively by mouth, and one dose is effective for several hours, while histamine cannot be administered orally, and, when given by injection, is not effective unless administered continuously by constant dripping. There is no claim that the hydrochloride acid part of Priscoline gives it its distinguishing characteristics, so one must look to the molecule as a whole (containing a coal-tar derivative and an imidazoline radical) for the peculiar therapeutic value of Priscoline.

The case of *Esso Standard Oil Co.* v. *United States*, 44 C. C. P. A. (Customs) 102, C. A. D. 644, holds that a material may be held to be a derivative of another substance, even though the product under consideration is composed of more than one kind of source material. The issue therein was whether certain naphthenic acid was a derivative of crude petroleum, and, as such, subject to a tax of one-fourth of 1 cent per gallon under the pertinent provisions of the Internal Revenue Code. The court pointed out:

It is evident that the naphthenic acid here could not have been produced without the use of crude petroleum. Appellant, citing *In re Matheson*, 49 Fed. 272, contends that one substance is not a derivative of another unless its determining characteristic is something which has been obtained therefrom; and that the determining characteristic of naphthenic acid is the hydrogen which was obtained from the sulphuric acid, since it is hydrogen "which makes of it an acid." However, in our opinion the most distinctive feature of the involved merchandise

is not merely that it is an acid, but that it is naphthenic acid, and the substances which give it the latter characteristic are obtained from crude petroleum.

The court further stated that:

* * * a substance may properly be said to have been derived from a source material even though the process by which it was produced from that material involved the addition of ingredients from other sources. Consequently, the fact that the instant merchandise contains hydrogen obtained from sulphuric acid does not preclude it from being a derivative of crude petroleum.

On the record as a whole, we are of the opinion, and hold, that Priscoline, the merchandise under consideration, is properly classifiable at the rate of 45 per centum ad valorem and 7 cents per pound under the provisions of paragraph 28 (a) of the Tariff Act of 1930, as a coal-tar medicinal. The protests herein are overruled. Let judgment be entered accordingly.