(C.D. 2284)

Sandoz Chemical Works, Inc. *v.* United States

United States Customs Court, First Division

(Decided September 20, 1961)

*Eugene R. Pickrell* (*Richard F. Weeks* and *George E. Long* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Joseph E. Weil, Murray Sklaroff, Sheila N. Ziff*, and *Richard E. FitzGibbon*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar, invoiced as Methylphenylethylhydantoin and hereinafter referred to as "Mesantoin," was classified under paragraph 28(a) of the Tariff Act of 1930 at the rate of 45 per centum ad valorem and 7 cents per pound as a coal-tar medicinal, under the provision therein for "other medicinals." Plaintiff claims the merchandise properly dutiable under paragraph 5 of the said act at the rate of 25 per centum ad valorem as a medicinal preparation, not specially provided for. It appears that the imported product is an anticonvulsant, used in the treatment of epileptic seizures.

Paragraph 28, Tariff Act of 1930:

(a) * * * acetanilide suitable for medicinal use, acetphenetidine, acetyl-salicylic acid, antipyrine, benzaldehyde suitable for medicinal use, benzoic acid suitable for medicinal use, beta-naphthol suitable for medicinal use, guaiacol and its derivatives, phenolphthalein, resorcinol suitable for medicinal use,

salicylic acid and its salts suitable for medicinal use, salol, and other medicinals; * * * all the foregoing products, provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651; * * * 45 per centum ad valorem and 7 cents per pound.

Paragraph 5, Tariff Act of 1930:

All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

Plaintiff, a manufacturer of pharmaceuticals and dyestuffs, contends that the words "and other medicinals," contained in paragraph 28(a), above quoted, are intended to embrace only those medicinal preparations wherein the coal-tar ingredient contributes to the therapeutic value of the preparation, maintaining, in this connection, that the coal-tar element in the imported product makes no contribution to its therapeutic effect. Plaintiff further contends that these same words, "and other medicinals," are intended to include only those medicinal preparations which are *ejusdem generis* with the 12 named substances in said paragraph 28(a) beginning with "acetanilide" to and through "salol."

The Government, on the other hand, in support of the collector's classification, maintains chiefly that the merchandise at bar, being chiefly used in the field of medicine, and being obtained, derived, or manufactured in whole or in part from one of the products provided for in paragraph 1651 of the tariff act, is properly classifiable under the provisions of paragraph 28 of said act. Further, the defendant contends that the rule of *ejusdem generis*, invoked by the plaintiff herein, is not applicable in the case at bar "as a matter of law," and that, even if the rule be held to be applicable in this case, plaintiff has failed to establish that the imported product, Mesantoin, is or is not *ejusdem generis* with the other named medicinals in paragraph 28(a).

Five witnesses testified on behalf of the plaintiff, the first of whom was Mr. Rocco Sorrentino, employed by the plaintiff since 1941 in the capacity of registered pharmacist. He is in charge of the tableting department and of compounding and manufacturing, and also supervises the raw materials chemical stock of the company. He identified two samples of the imported merchandise which were withdrawn under his direction (plaintiff's collective exhibit 1, R. 8). A deposition by Dr. August Binkert, director of Sandoz, Ltd., Basel, Switzerland, who supervised the production of Mesantoin at the foreign plant of the plaintiff company, together with a certificate of translation of the answers to questions propounded, was received in evidence as plaintiff's collective exhibit 2 (R. 12). Dr. Binkert described the production of "Mesantoin" as follows:

12.) The 5,5-phenylethylhydantoin is obtained by condensation of phenylethyl-ketone (propiophenone) with sodium cyanide, ammonia and carbonic acid in aqueous-alcoholic solution. It is methylated to 3-methyl-5, 5-phenyl-ethyl-hydan-toin in aqueous-alcoholic solution with dimethylsulfate and purified by recrystal-lization from alcohol.

It appears from said deposition, as disclosed by its structural formula, that there are four groupings in the imported Mesantoin, namely, a phenyl group, which is the $C_6H_5$ group in the structural formula, an ethyl group, a methyl group, plus hydantoin (R. 17).

Mr. Dominick Maresca, chief chemist for Sandoz Chemical Works, Inc., at its New Jersey plant, testified that he was familiar with the method of production of Mesantoin, as heretofore described by Dr. Binkert; that one of the starting materials used in this method of production was propiophenone which is "phenylethylketone" contain-ing a phenyl group, explaining, in this connection, that a ketone is "a carbonyl group linked to two either alkyl or aryl groups, which may be alike or different" (R. 14). Plaintiff's witness stated that there are ketones that have no phenyl group, such as methylethylketone, and that the latter could be used in the production of hydantoin. Mr. Maresca then stated that the finished product, Mesantoin, has this phenyl group, inasmuch as "We started with it in the propiophenone, so it winds up in the end product. The process called for it" (R. 15). The witness testified, in this connection, that the finished product, Mesantoin, is a "compound" (R. 18) made up of four basic atoms. The witness agreed that, in the production of Mesantoin, you start with the benzene ring, a coal-tar derivative, and wind up with that as part of the final product (R. 25). On cross-examination, Mr. Maresca testi-fied that the finished Mesantoin is not a mixture of the ethyl, methyl, phenyl, and hydantoin groupings, but that it is one chemical identity (R. 31).

Plaintiff's third witness was Dr. Harry L. Kozol, recipient of the degree of bachelor of science, Harvard University, 1927, and doctor of medicine, Harvard, 1934. The record discloses Dr. Kozol had studied organic, analytical, and advanced inorganic chemistry; that he had been house officer in medicine, Massachusetts General Hospital, from 1934–1936; that he had taught in Harvard Medical School, 1937; that he had been house officer, Johns Hopkins University, Department of Psychiatry, 1937–1938, and, while at the latter institution, had taught in the Department of Psychiatry (R. 36–38).

Dr. Kozol testified that he had specialized in the field of epilepsy and that he had used the imported product, Mesantoin, in the treatment of epileptic cases; and that he had also treated such cases while at Johns Hopkins. The record further discloses that, in 1944, plaintiff's witness became director of the Epilepsy Clinic of Boston City Hospital con-nected with the Department of Neurology of Harvard Medical School,

and that, while there, performed general neurological work, specifically in the field of epilepsy (R. 41–42), at which time he first became interested in "Mesantoin" (R. 47). This witness is presently on the faculty of Harvard Medical School where he teaches neurology. Dr. Kozol has written numerous articles on the subject of epilepsy and its treatment, specifically with respect to the imported product, Mesantoin.

Dr. Kozol further testified that, based upon his experience as a practicing physician, his treatment of epileptic patients, and his readings and writings on the subject, the "phenyl group, or groups in the case of diphenylhydantoin, is valuless, and accounts for undesirable effects, and I think that all of these compounds would be more valuable as anti-convulsants, and safer, and freer of undesirable side effects if these compounds were minus, or devoid of this or these phenyl rings" (R. 54–55). He further stated that, with the use of phenylated hydantoins, there often occurs "mechanical unsteadiness" in the patient. The witness also testified that he had succeeded in getting a modest amount of methylethylhydantoin, a hydantoin minus the phenyl group, which produced no adverse side effects and no ataxia, and which he found effective for use as an anticonvulsant (R. 57–58). In this connection, Dr. Kozol, when asked, on cross-examination, whether methylethylhydantoin was accepted generally throughout the medical profession for the treatment of epilepsy, stated "it is virtually unknown except on a theoretical and research basis" (R. 66). He further testified that Mesantoin is an "ethical" pharmaceutical, that is, one which is available to patients only on prescription by physicians (R. 61).

Dr. Jack B. Jewell, a physician and vice president and medical director of Ayerst Laboratories, manufacturer of ethical pharmaceuticals, was also called as a witness by the plaintiff. He testified that he was familiar with the 12 medicinals named in subject paragraph 28, having dispensed them, prescribed them, and having had experience with them both in pharmacy and in medicine. He stated that acetanilide, acetphenetidine, acetylsalicylic acid, and antipyrine are used as analgesics; benzaldehyde as a flavoring agent; benzoic acid as a preservative and also as an ingredient in certain dermatological preparations; beta-naphthol as an antiseptic agent; guaiacol and its derivatives as an expectorant; phenolphthalein as a laxative agent; resorcinol in dermatological preparations; salicylic acid mostly as a keratolytic agent and also in corn remedies and skin preparations; and salol as an antiseptic agent and in sunburn preparations. Dr. Jewell described all of the above as proprietary medicinals, i.e., those which are advertised directly to the consuming public and which can be purchased without prescription in a pharmacy (R. 82–86).

Plaintiff's last witness was Mr. Lugard S. Haight, a registered pharmacist since 1915 and presently associated with Ayerst Laboratories as coordinator in the product development division of that company. Mr. Haight testified that he has had experience with the medicinals *eo nomine* provided for in paragraph 28 (a), *supra*, having handled them as pharmaceuticals or as chemicals and having compounded them as well as having dispensed them. His testimony relative to the use of such medicinals was substantially similar to that given by plaintiff's witness, Dr. Jewell.

The defendant called as its witness Dr. David Wylie, a physician registered in the State of New York, presently in charge of the neuropharmacology section of Sterling Winthrop Research Institute, in which capacity Dr. Wylie has under his supervision a group of people engaged in the discovery of drugs which may have an action in the central nervous system. In the latter connection, one of the groups of compounds tested by him and his associates is anticonvulsants which, as heretofore indicated, are used in the treatment of epilepsy. The record shows that Dr. Wylie himself holds a number of degrees: B.S.E. in pharmacy, Glasgow University, 1946; doctor of philosophy in pharmacology and bacteriology, Glasgow University, 1949; medical degree, Glasgow University, 1953. He had also studied and done research work in pharmacology, Kings College, London, England, 1954–1955; also, had been a medical officer in the Ministry of Health, London, 1955–1956, where he was involved in the administration and control of drugs (R. 94–95).

Dr. Wylie testified that he had experimented with a product called "5-ethyl 3-methyl hydantoin," which, he stated, is, chemically, Mesantoin with the benzene ring removed and which product is used in tests against electrically induced convulsions on mice. The witness stated that, after certain of these tests, he determined that "5-ethyl 3-methyl hydantoin," that is, the Mesantoin without the phenyl group, had no anticonvulsant effect at any level (R. 100). Dr. Wylie further stated that he was familiar with a product called "ethytoin," described as "5-phenyl 3-ethyl hydantoin," which he stated has the same phenyl group as Mesantoin, but which has the methyl group removed (R. 104) and which is presently used in the treatment of epilepsy in children. With respect to the relative degrees of toxicity of products used in the treatment of epilepsy, Dr. Wylie concluded, from his experience, that the product "diphenylhydantoin," heretofore referred to by plaintiff's witness Dr. Kozol, known in the trade as dilantin and which is a product with two phenol groups, is the least toxic hydantoin at present in use; that Mesantoin is extremely toxic; and that ethytoin is less toxic than Mesantoin (R. 106). This witness then testified that, from his experience and personal knowl-

edge, he knew of no hydantoin derivative used in the treatment of epilepsy which is without a phenyl group (R. 107).

On cross-examination, Dr. Wylie testified that his connection with the treatment of patients for epilepsy, while he was associated with a mental hospital at the time he was studying for his medical degree, was in observation of the work of physicians treating epileptics; that, at such time, he taught pharmacology to duly licensed physicians, but that his teaching did not cover the treatment of epilepsy nor did he, himself, actually treat patients suffering from epileptic seizures (R. 108–109).

In support of its preliminary contention that a medicinal derived in part from a coal-tar substance is not dutiable under paragraph 28(a), *supra*, if the coal-tar ingredient or radical does not impart the therapeutic property to the product, plaintiff, in its brief, directs our attention to the holdings in certain cases which it deems decisive of the present issue. *In re Roessler & Hasslacher Chemical Co.*, 49 Fed. 272, affirmed 56 Fed. 481; *Magnus* v. *United States*, 1 Ct. Cust. Appls. 166, T.D. 31212; *International Trading Co. et al.* v. *United States*, 51 Treas. Dec. 1067, Abstract 1898, affirmed in *United States* v. *International Trading Co. et al.*, 15 Ct. Cust. Appls. 348, T.D. 42511; *J. B. Roerig and Company* v. *United States*, 26 Cust. Ct. 131, C.D. 1313; *Fougera & Co.* v. *United States*, 49 Treas. Dec. 986, T.D. 41632; *Fraisse Laboratories (Inc.)* v. *United States*, 56 Treas. Dec. 356, T.D. 43638; *McKesson & Robbins* v. *United States*, 3 Ct. Cust. Appls. 515, T.D. 33167. The holdings in the cases above cited, in our opinion, however, are not controlling in determining the proper classification of the merchandise under consideration, either because the same issues were not in question and the cases are, accordingly, not in point and distinguishable, or because they are no longer applicable with respect to the provisions of paragraph 28(a) here involved.

This court, in *Ciba Pharmaceutical Products, Inc.* v. *United States*, 40 Cust. Ct. 307, C.D. 1999 (suit 4970 before the United States Court of Customs and Patent Appeals, dismissed April 7, 1960, Abstract 64249), considered, *inter alia*, the *Roessler* and *Magnus* cases, *supra*, as follows:

In the *Magnus* case, *supra*, decided in 1911, the merchandise consisted of artificial musk classified under paragraph 3 of the Tariff Act of 1897 as a chemical compound, not specially provided for. The importer claimed the merchandise classifiable under paragraph 15 of that act for "Coal-tar dyes or colors, not specially provided for in this Act, * * * all other products or preparations of coal tar, not colors or dyes and not medicinal, not specially provided for in this Act, * * *." In holding that the involved product was not classifiable as claimed, the court, at page 167, stated:

* * * aside from any quantitative predominance in order to bring the article within purview of that statute it should be shown by the party holding the affirmative that coal tar was a dominating element to the extent

that the efficiency, or at least the dominating characteristic, of the imported merchandise was derived from coal tar. In this case such proof is not made in the record.

The court cited with approval the following statement from *In re Roessler & Hasslacher Chemical Co.* (49 Fed. 272), and affirmed in the same case (56 Fed. 481):

> Nor is it particularly material that other substances have been added, if the *determining characteristic of the product or preparation* is something which it has received from coal tar * * *. [Italics quoted.]

The *Magnus* and *Roessler* cases, *supra*, involved interpretation under the Tariff Act of 1897. As pointed out by the court in the *Ciba Pharmaceutical* case, *supra*, there was no provision for preparations derived in part only from coal tar, nor was there a provision for medicinals in the paragraph under consideration in those cases. The *Roessler* and *Magnus* cases, therefore, are not controlling in the case at bar.

The *International Trading Co.* cases, *supra*, likewise are not applicable to the question here presented. The merchandise involved in the latter cases consisted of medicinal capsules, containing a mixture of "sandalwood oil, oil of resin, methyl salicylate, and chlorophyll," classified under paragraph 28 of the Tariff Act of 1922, providing for "methyl salicylate * * * and other synthetic odoriferous or aromatic chemicals," not mixed and not compounded, and "all mixtures * * * excepting mixtures of synthetic odoriferous or aromatic chemicals." The court, in the *International Trading Co.* cases, decided the issues solely on the ground of the interpretation of the mixture provisions of paragraph 28 there involved and the "exceptions" in said paragraph. While the appellate court (T.D. 42511) observed that the synthetic methyl salicylate in the involved product did not contribute to the therapeutic value of the preparation, the medicinal aspects as here advanced by the plaintiff were not passed upon.

The *Fraisse Laboratories* and *McKesson & Robbins* cases, *supra*, did not involve coal-tar provisions as are here under consideration. Nor did the provisions there in question involve the language "obtained, derived, or manufactured in whole or in part" of anything, let alone a coal-tar substance. The court decided the cases merely on a factual basis on the records there made.

With respect to the *Roerig & Co.* and the *Fougera & Co.* cases, *supra*, we are of opinion that those cases, however much the court therein might have spoken with reference to a requirement that the coal-tar portion in a product be the dominant characteristic for classification under paragraph 28(a), *supra*, are not controlling in view of the holding, hereinafter referred to, of this court in the *Ciba Pharmaceutical Products* case, *supra*, and that in the case of *Sandoz Chemical Works, Inc.* v. *United States*, 34 Cust. Ct. 182, C.D. 1702

(affirmed in *Same* v. *Same*, 43 C.C.P.A. (Customs) 152, C.A.D. 623). In the *Sandoz* case, *supra*, this court, page 187, stated:

That the homatropine hydrobromide in question is suitable for medicinal use is amply supported by the record, as hereinabove set forth, and since it is conceded that the product is obtained, derived, or manufactured in part from toluene, a coal-tar product that is specifically provided for in paragraph 1651, the present merchandise is within the class of products contemplated by said paragraph 28(a), as classified by the collector.

On appeal, the court, in the *Sandoz Chemical* case, *supra*, held that the term "medicinal" in paragraph 28(a) includes any substance which is capable of being used in the medical profession for either diagnosis of disease or treatment of disease, and also went into the question of relative specificity between paragraph 28 and paragraph 45 (bromine and all bromine compounds not specially provided for) of the tariff act. It apparently, however, adopted the above-enunciated conclusion of the trial court setting forth the requirements for inclusion of a product under paragraph 28(a).

Whether or not an anticonvulsant effective against epilepsy has been or can be produced without the employment of a phenol group is not, in our opinion, decisive in our present determination. The fact of the matter is that, in the case at bar, the imported product, Mesantoin, does contain the phenol group and the record, we believe, is sufficiently conclusive to establish that the phenol group contained therein contributes to the effectiveness of the finished product. As testified to by plaintiff's witness Maresca, the Mesantoin has a phenol group, the $C_6H_5$ group in the structural formula, which comes from the starting material, propiophenone or phenylethylketone. This is the benzene ring structure appearing in phenol form (R. 25–26), and "is a coal-tar derivative" (R. 25). In this connection, the same witness testified with respect to this starting material, propiophenone, that "it winds up in the end product. The process called for it" (R. 15), stating, in this connection, that "This whole thing is a compound * * * Mesantoin" (R. 18). He further stated, on cross-examination, that if any other ketone were used in the process, such as ethyl-methylketone instead of phenylethylketone, a hydantoin derivative would be formed, but not this particular hydantoin, Mesantoin (R. 33). Accordingly, it appears from the record that all of the groupings that go to make up the finished product in the case at bar contribute to its ultimate therapeutic property. As was stated by the court in *Plant Products Corporation* v. *United States*, 44 C.C.P.A. (Customs) 183, C.A.D. 658, at page 185:

* * * We agree with the conclusion [by the trial court] that the insecticidal properties of Parathion are due to the molecule as a whole, and that the coal-tar portion is essential to such properties.

There is testimony in the record that Mesantoin has disastrous side effects in its application in the treatment of epilepsy. Plaintiff's

witness, Dr. Kozol, agreed, however, that this problem of side effects manifests itself in all medicine, when one is dealing with drugs of a chemical nature (R. 69), and that the fact that there are some side effects will not necessarily militate against the use of a particular preparation or compound (R. 70).

One of the plaintiff's contentions in this case, as heretofore noted, is that the imported product is not *"ejusdem generis"* with the named medicinals in paragraph 28(a), *supra*, and that such is a requirement in order that the product at bar be embraced within the said provision covering the named medicinals. In the case of *United States* v. *C. J. Tower & Sons*, 44 C.C.P.A. (Customs) 1, C.A.D. 626, the court therein, discussing the rule of *ejusdem generis*, page 5, stated:

> The rule of *ejusdem generis* (where particular words of description are followed by general terms, the latter refer only to things of a like class with those particularly described) is a well known rule of construction, often used by this court, to aid in arriving at the legislative intent of Congress, which, of course, is the ultimate consideration in the construction of tariff statutes. The rule is primarily designed to preserve the meaning of the particular words as well as to give to the general words an interpretation consistent with the manifest purpose of the entire act. *Overton & Co.* v. *United States*, 2 Ct. Cust. Appls. 422, T.D. 32172. The latter purpose subserves an even more fundamental purpose of giving effect, if possible, to *all* words in a statutory provision, since the legislature is not presumed to have used superfluous words. 2 SOUTHERLAND [*sic*], STATUTES AND STATUTORY CONSTRUCTION § 4909, at 398 (3rd ed. 1943); *Carey & Skinner, Inc.* v. *United States*, 42 C.C.P.A. (Customs) 86, C.A.D. 576. [Italics quoted.]

In the case of *Kuttroff, Pickhardt & Co., Inc.* v. *United States*, 21 C.C.P.A. (Customs) 332, T.D. 46864, at page 339, our appellate court, after pointing out that the master rule of statutory construction is "to ascertain the legislative intent," stated as follows:

> * * * It will be noted that the first words in said paragraphs 27 and 28 are "Coal-tar products:" and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs. A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish this purpose it named definitely a great number of articles and materials, and then, by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs. * * *

Plaintiff, in the case at bar, takes the position that the rule of *ejusdem generis* is applicable with respect to the classification of the product at bar as a matter of law. We are of opinion that this contention of the plaintiff is without merit. In *United States* v. *Herman H. Sticht & Co.*, 22 C.C.P.A. (Customs) 40, T.D. 47048, at page 44, our appellate court stated:

> * * * The master rule of construction, in the consideration of all statutes is so to interpret them as to carry out the legislative intent, and any rule of con-

struction must yield if the legislative intent is shown to be counter to the apparent intent indicated by such rule. *United States* v. *Clay Adams Co., Inc.*, 20 C.C.P.A. (Customs) 285, T.D. 46078.

Similarly, in *Inter-Maritime Forwarding Company, Inc.* v. *United States*, 29 Cust. Ct. 122, C.D. 1456 (reversed in *United States* v. *Inter-Maritime Forwarding Co., Inc.*, 41 C.C.P.A. (Customs) 107, C.A.D. 537, on other considerations), the court, at page 124, stated:

> The function of the *ejusdem generis* rule is as an aid in ascertaining the intention of the legislature. *Texas* v. *United States*, 292 U.S. 522. It therefore has no controlling effect if the intention of the legislature can be otherwise ascertained, and it cannot be employed to restrict the operation of an act within narrower limit than was intended by the legislature.

The court, in the above statement, cited as authority Crawford's "The Construction of Statutes" (1940), section 191.

The legislative intent with respect to the coal-tar provisions of the tariff act has already been determined by the courts. *Kuttroff, Pickhardt & Co., Inc.* v. *United States, supra.* Based upon the legislative history of paragraph 28(a) of the Tariff Act of 1930 under consideration and the decisions of our courts with respect to its applicability, we are of opinion that further interpretation to establish the legislative intent with respect to the paragraph in question is unnecessary in our present determination, and we are further of opinion that the rule of *ejusdem generis* is not applicable, as a matter of law, in the case at bar.

It may be stated, in passing, without conceding that the rule of *ejusdem generis* is applicable herein, that the plaintiff has failed to establish that Mesantoin is not *ejusdem generis* with the other named medicinals in paragraph 28(a). In support of the contention that Mesantoin is not *ejusdem generis* with the medicinals so named, there is testimony in the record that Mesantoin is a so-called "ethical" pharmaceutical—one which can be obtained only on a doctor's prescription—whereas the medicinals named in paragraph 28(a) are "proprietary" medicines which are sold over the counter to the public without a prescription. We do not believe that this claimed distinction should preclude the imported product from being classified under paragraph 28(a). Plaintiff's witness, Dr. Kozol, admitted, on cross-examination, that there are some ethical pharmaceuticals sold over the counter without a prescription (R. 62), and, further, that physicians, as a matter of practice and ethics, require prescriptions for some drugs for which the law does not require prescriptions (R. 64). It further appears that Federal and State law controls the sale of drugs, which may at one time remain on a list calling for prescriptions but which may thereafter be removed from such list. In our opinion, therefore, the classification of medicinals named under paragraph 28(a) should not be subject to such flexible regulations.

The imported product herein, Mesantoin, is, concededly, a medicinal and, whether ethical or proprietary, is subject to classification under paragraph 28(a), the product in addition being obtained, derived, or manufactured in part from a coal-tar substance.

In holding the product there under consideration properly classifiable under the provisions of paragraph 28(a) of the tariff act as a coal-tar medicinal, this court, in the *Ciba Pharmaceutical* case, *supra*, page 315, stated:

> * * * The true test of whether Priscoline is properly classifiable under paragraph 28(a) of the Tariff Act of 1930 is *not*, therefore, whether a coal-tar product gives Priscoline its dominating characteristic as a medicinal, but whether it is derived in whole or in part from a product provided for under the terms of paragraph 28(a), or paragraph 27 or 1651, of the Tariff Act of 1930, its use as a medicinal being conceded. [Italics quoted.]

In our opinion, there is nothing in the case at bar which is of sufficient force to persuade us to reach a conclusion at variance with that found in the *Ciba Pharmaceutical* case, *supra*, as above stated.

For all of the reasons stated herein, we hold the involved product, Mesantoin, properly dutiable under the provisions of paragraph 28(a) of the Tariff Act of 1930, at the rate of 45 per centum ad valorem and 7 cents per pound, as a coal-tar medicinal under the provision in said paragraph for "other medicinals * * * obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651," as classified.

The protest is overruled. Judgment will be entered accordingly.